Thomas L. LIPPARD, Appellant,

v.

HOUDAILLE INDUSTRIES,
INC., Respondent.

No. 67802.

Supreme Court of Missouri,
En Banc.

Aug. 1, 1986.

Rehearing Denied Sept. 16, 1986.

Stephen F. Meyerkord, St. Louis, Francis M. Luehrman, Clayton, for appellant.

Ben Ely, Jr., Rochelle Kaskowitz, St. Louis, for respondent.

Michael W. Manners, Independence, amicus curiae for MATA.

W. James Foland, Ted. R. Osborn, Kansas City, amicus curiae, for Mo. Organ. of Defense Lawyers.

BLACKMAR, Judge.

In this case of first impression with us we are called upon to decide whether the comparative fault principles of *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983) apply to strict products liability cases. After considering thorough briefs, excellent oral argument, cases from other jurisdictions, and scholarly writings, we conclude that comparative fault should not be applied in cases of this kind.

The facts are simple. The plaintiff had the duty of operating a planing machine in the course of his employment. The blades of the machine were protected by a metal guard which was designed to close after the board being planed had cleared the cutterhead. A board slipped out of the plaintiff's hand and he reached down to catch it as it fell. The guard plate had not covered the blades as it should have and his hand engaged the blades, resulting in the loss of two fingers and severe laceration of others.

The plaintiff brought suit on two strict liability theories, alleging both that the planing machine was defective and unreasonably dangerous and that inadequate warning of the danger had been given. The defendant sought and obtained an instruction directing the jury to assess a percentage of fault against the plaintiff if it found that his negligence had contributed to his injury. The jury determined that the plaintiff had been damaged in the amount of $75,000.00, and that each party was 50% at fault. The trial court therefore entered judgment for the plaintiff in the amount of $37,500.00. The plaintiff appealed. The Court of Appeals affirmed, accompanying its decision with eloquent and well reasoned opinions finding that comparative fault should be applied in products liability cases. Because we disagree with the trial court and the Court of Appeals on this issue, we reverse and remand with directions to enter judgment for the full amount of plaintiff's damages as determined by the jury.

Missouri products liability law has its origin in *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo. banc 1969). This case followed the lead of Restatement (Second) of Torts, § 402 A, which states emphatically that liability may be found if a person is injured by a defective product unreasonably dangerous, even though the manufacturer or supplier has taken all possible precautions. *Id.* Sec. 402(a)(2). Missouri courts have consistently applied this principle in a line of authority culminating in *Elmore v. Owens-Illinois Glass Co., Inc.,* 673 S.W.2d 434 (Mo. banc 1984) in which we held that a manufacturer could be liable for a defective product, even though the state of the art at the time of manufacture or sale was such that the defective character could not have been known. The purpose of products liability law, essentially, is to socialize the losses caused by defective products.

Inasmuch as negligence is not an element of a products liability case, *Blevins v. Cushman Motors,* 551 S.W.2d 602 (Mo. banc 1977), we have consistently held that the claimant's contributory negligence does not operate as a bar to recovery. *Keener, supra* at 365; *see also Uder v. Missouri Farmers Association, Incorporated,* 668 S.W.2d 82 (Mo.App.1983).

*Gustafson v. Benda, supra,* introduced the concept of comparative fault into Missouri negligence law. This opinion abolished contributory negligence as a bar to the plaintiff's recovery in negligence cases, and also abolished the humanitarian doctrine and the doctrine of last clear chance as expedients through which a plaintiff who is negligent in some degree may sometimes recover. The case substituted a rule under which the jury may assign a percentage of fault to the plaintiff and to all defendants. The plaintiff's recovery is then reduced by such percentage of fault, if any, as the jury may find to be attributable to him or her.

*Gustafson v. Benda* began as a humanitarian case. It involved only negligence concepts, and could not be an appropriate vehicle for determining rules of products liability law. This Court, in the common law tradition, decides only the case before it. A holding that comparative fault applies to products liability cases, then, must go beyond *Gustafson.*

There has been confusion because annotated sections of the Uniform Comparative Fault Act were appended to the *Gustafson* opinion, as a guide to proceedings in comparative fault cases. It was not the purpose of *Gustafson* to enact that model act as a virtual statute of the state of Missouri, to establish substantive principles control-

ling cases not then before the Court. Much less was there any purpose of giving special authority to the annotations and commissioners' comments. The direction in the opinion was simply to apply the procedures of the Uniform Comparative Fault Act "insofar as possible." The uniform act, for example, commits us to "pure" comparative fault in negligence cases, rather than to a system in which the plaintiff recovers nothing if his or her fault exceeds the defendants'. But the Act does not give authentic guidance in solving the case now before us.[1]

The respondent argues eloquently, however, that the rule of comparative fault is a fair one in products liability cases just as in negligence cases, that it gives product users a motive for being more careful, and that it states a good rule for decision. Authorities in other states are divided on the point.[2] We therefore make the choice for ourselves, based on our doctrines of products liability, as expounded in our numerous cases.

■■■■ We conclude that there should be no change in the Missouri common law

rule, as established in the *Keener* opinion (l.c. 365), that the plaintiff's contributory negligence is not at issue in a products liability case. It should neither defeat nor diminish recovery. The defendant may sometimes make use of the plaintiff's alleged carelessness in support of arguments that the product is not unreasonably dangerous, or that the alleged defects in a product did not cause the injury, but these are traversing claims not appropriate for instruction. If the defective product is a legal cause of injury, then even a negligent plaintiff should be able to recover.

Contrary to what is said in Judge Donnelly's dissent, this opinion does not eliminate the giving of MAI 32.23 in an appropriate case. It is true that the defendant requested two instructions based on MAI 32.23 and directing the jury to assess a "percentage of fault" against the plaintiff if it found that he voluntarily and unreasonably exposed himself to a known danger. The trial judge refused these instructions and the defendant does not argue for them on appeal, even conditionally. We perceive no evidence that the plaintiff knew

---

1. We note the opinion of Circuit Judge Arnold in *Gearhart v. Uniden Corporation of America,* 781 F.2d 147 (8th Cir.1986), in which he performs his required duty of "predicting" what our Court might do if asked to apply comparative fault concepts to a products liability case. His prediction is understandable, by reason of the appendix to our *Gustafson* opinion, but he gives the appendix a substantive effect which goes beyond the issues in that case, and which we do not now choose to give to it.

2. As revealed by the briefs, oral argument, and independent research, there appear to be four approaches to this problem. It must be noted that, in each state, the decision of which approach to take has been influenced by that particular state's statutes or common law relating to strict liability and comparative fault. Thus, these cases have limited value for assisting us in making a decision based on Missouri law.

The Court of Appeals espoused the viewpoint of the California Supreme Court in *Daly v. General Motors Corporation,* 20 Cal.3d 725, 144 Cal. Rptr. 575 P.2d 1162 (1978), in which the California court found that comparative fault should be applied in all strict liability cases, with no limitations based on the level of the plaintiff's culpability. The Hawaii Supreme Court has

also adopted this approach, *Kaneko v. Hilo Coast Processing,* 65 Hawaii 447, 654 P.2d 343 (1982).

In contrast, some courts have refused to apply comparative fault principles in strict liability cases. *E.g. Kinard v. Coats Company, Inc.,* 37 Colo.App. 555, 553 P.2d 835 (1976) (legislatively altered by Colo.Rev.Stat. § 13–21–406 (1985 Supp.)); *Seay v. Chrysler Corp.,* 93 Wash.2d 319, 609 P.2d 1382 (1980).

Other jurisdictions have taken two intermediate viewpoints: 1) Comparative fault principles should be applied in those cases where the plaintiff's culpability would have amounted to a defense under prior strict liability law. *E.g. Austin v. Raybestos-Manhattan, Inc.,* 471 A.2d 280 (Me.1984) (only in assumption of risk situations); *Suter v. San Angelo Foundry and Mach. Co.,* 406 A.2d 140, 81 N.J. 150 (1978) (in any situation where contributory negligence would have been a defense to a strict liability action). 2) Comparative fault principles should be applied in cases involving any level of plaintiff culpability, including negligence, except where plaintiff's negligence consisted solely of a failure ·to guard against or discover the defect which caused the injury. *E.g. Busch v. Busch Const., Inc.,* 262 N.W.2d 377 (Minn.1977); *Duncan v. Cessna Aircraft,* 665 S.W.2d 414 (Tex. 1984).

that the guard had failed to close. The defendant's basic claim, rather, was that he had "failed to look where he had placed his right hand." Thus, it appears that instructions in the 32.23 pattern are not supported by the evidence in the record, and were properly refused.

Reference has been made to situations in which defendants have been held to share liability on the basis of percentages determined by the jury, in cases in which some defendants were held liable on a negligence theory and others by reason of strict products liability. In this case there is only one defendant and the conclusions here expressed have nothing to do with sharing of liability by defendants under principles first enunciated in *Missouri Pacific Railroad Company v. Whitehead & Kales Company*, 566 S.W.2d 466 (Mo. banc 1978).[3]

If there is dissatisfaction with our conclusion, the state and national legislatures may be addressed.[4] A legislature is far more capable than we are of determining whether there are problems in the products liability area, requiring changes in the law. We adhere to the view that distributors of "defective products unreasonably dangerous" should pay damages for injuries caused by the products, without reduction because a plaintiff may have been guilty of a degree of carelessness. The fact that some recoveries may be reduced is not a sufficient reason for changing the underlying principles of our products liability law.

■ Plaintiff sought to introduce testimony about his desire to become an architect and how the injuries caused by the accident prevented him from performing architectural tasks. The defendant objected to testimony on these points and the objections were sustained. Plaintiff made offers of proof indicating that (1) he would have testified that he wished to become an architect and that his employer would have

sent him to architectural school, and (2) his doctor had advised him not to become an architect because his hand wasn't strong enough for the job. At the time of the accident, the defendant was not an architect and had not trained to become one. Any evidence concerning his loss of future earnings as an architect would have been speculative and its exclusion was not error. *Thienes v. Harlin Fruit Company*, 499 S.W.2d 223 (Mo.App.1973).

The verdict, in spite of the errors in submission, provides a sufficient basis for calculating the plaintiff's damages on a proper legal theory. *Cf. Hudson v. Carr*, 668 S.W.2d 68 (Mo. banc 1984). The judgment is reversed and the cause is remanded with directions to enter judgment for the plaintiff for the full amount of damage determined by the jury.

HIGGINS, C.J., concurs.

BILLINGS and RENDLEN, JJ., concur in separate opinions filed.

ROBERTSON, J., concurs in result in separate opinion filed.

DONNELLY and WELLIVER, JJ., dissent in separate opinions filed.

BILLINGS, Judge, concurring.

I concur. I write only to quote the wisdom of Dean Pound:

The opinions of the judge of the highest court of a state are no place for intemperate denunciation of the judge's colleagues, violent invective, attributings of bad motives to the majority of the court, and insinuations of incompetence, negligence, prejudice, or obtuseness of fellow members of the court.

\* \* \* \* \* \*

Constitutions and justice according to law are today under attack throughout the world.... Maintenance of our char-

---

**3.** Many plaintiffs combine allegations of strict liability against one defendant with allegations of negligence against another defendant in their initial petition. *Vanskike v. ACF Industries, Inc.*, 665 F.2d 188 (8th Cir.1981). *See also Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371

(Mo. banc 1986) (case submitted to jury only on strict liability allegations).

**4.** *See, e.g.,* Colo.Rev.Stat. § 13–21–406 (1985 Supp.).

acteristic American constitutional-legal polity demands that the courts hold, as they have held in the past, the respect and confidence of the public. What amounts to attacks upon our courts from within, however well intentioned and motivated ... are highly unfortunate....

Roscoe Pound, Cacoethes Dissentiendi: The Heated Judicial Dissent, 39 Amer.B. Assn.J. 794 (1953).

RENDLEN, Judge, concurring.

I concur in the well-reasoned opinion of Judge Blackmar and write to address the dissent of Welliver, J. Today in sonorous tones he pretends to mourn the "covert overruling" of *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983). While there are many who would not long grieve if that case experienced an early demise, the principal opinion sounds not the death knell of *Gustafson,* instead the bell tolls only for Welliver, J.'s failed attempt in *Gustafson* to rule questions not then before us.

As Judge Blackmar's principal opinion and the concurring opinion of Robertson, J., aptly demonstrate, *Gustafson* introduced comparative fault into Missouri negligence law, but it did not and could not have determined the applicability of comparative fault to strict products liability cases. Welliver, J., in characterizing *Gustafson* as dispositive, unabashedly proclaims that in *Gustafson* we ruled issues not then before us. Such a grab for general legislative power on behalf of the judiciary was not then and should not now be countenanced, and yet Welliver, J., insists that the Court indulged such practice. At the time of our holding in *Gustafson* it was all too obvious that the current question as well as innumerable others remained to be decided, and this was recognized in the statement that "[l]ittle imagination is required to envision the volume of litigation and endless appeals required to return a semblance of stability to our tort law." *Id.* at 29 (Rendlen, J., dissenting).

Prior to the adoption of comparative fault in *Gustafson,* contributory negligence was not a defense to strict liability. *Keen-*

*er v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362, 365 (Mo.1969). Consistent with *Keener,* we now hold that comparative fault, the doctrine that supplanted contributory negligence, is similarly inapplicable to strict liability. Welliver, J., fails to explicate why we now should ignore the obvious implication of *Keener.*

The facts before us constitute a textbook example of the unsuitability of comparative fault to products liability. Plaintiff's alleged "fault" consisted of placing his hand too close to the malfunctioning cutterhead guard. Yet plaintiff's complacency can be directly attributed to the previously proper functioning of the guard and his expectation that it would continue to function properly.

> If plaintiff is involved in negligent activity while either using or misusing the product, it may be that we ought to demand that the product be designed and marketed so that the particular offensive use will either be precluded or mitigated by some design parameter of the product. If this is the desideratum of the law, then it becomes very questionable whether plaintiffs should have their verdicts reduced *when the very aspect which made the product dangerous and defective in the first instance has resulted in the very harm which one could expect from the defective design.*

Twerski, *From Defect to Cause to Comparative Fault—Rethinking Some Product Liability Concepts,* 60 Marq.L.Rev. 297, 343 (1977).

Welliver, J.'s endeavor to pen an epical tragedy would afford his readers a weak measure of comedy were it not for the seriousness of the law. Unfortunately he mistakes the judicial opinion as a platform from which to deliver a harangue and to compile a catalog of those decisions with which he disagrees, accompanied by a peevish assault upon his brethren. By misappropriating the litigants' cause for use as a private rostrum, the dissent sadly demeans the office of the judiciary. This unfortunate exercise in self-aggrandizement and

tasteless satire mocks an important issue and belittles the litigation and the litigants.

I was not among those in 1983 who saw fit to adopt *Gustafson,* but it remains viable today and the dark tragedy invented by the dissent becomes what it is, a thinly veiled pretense for misdirected invective. The work of this Court which Welliver, J., seeks to disparage will be measured not by his unusual personal standard but against the test suggested by the honorable Justice Holmes: "[T]he best test of truth is the power of the thought to get itself accepted in the competition of the market...." *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting).

ROBERTSON, Judge, concurring in result.

We have come full circle. In doing so, we prove the truth that the fruit of judicial trespass into areas properly reserved to the legislative branch of government[1] is not a blessing, but a curse.

From 1975 to 1983, this Court resisted the temptation to replace contributory negligence with the doctrine of comparative fault by an exercise of judicial will. *Anderson v. Cahill,* 528 S.W.2d 742 (Mo. banc 1975); *Epple v. Western Auto Supply Co.,* 557 S.W.2d 253 (Mo. banc 1977); *Steinman v. Strobel,* 589 S.W.2d 293 (Mo. banc 1979).

> [W]e have concluded not to adopt any form of comparative negligence at this time. The subject is complex and takes a variety of forms in the several states where it is in use. The fact that conversion to such a new system involves many policy decisions may be the reason why most states which have adopted the doctrine in some form, have done so by legislative action.... The issue seems suited for legislative action.

*Epple, supra* at 254.

To adopt comparative negligence without undertaking a systematic treatment

of this multitude of related issues would be to place the bar on a violent and stormy sea of uncertainty and frustration that would make the post-Whitehead and Kales era seem a serene and placid mountain lake in comparison. Any single opinion that would attempt to deal with all of these issues could only result in a giant legislative enactment by judicial fiat.

*Steinman, supra* at 294 (Welliver, J. concurring).

By 1983, however, the temptation proved too powerful to resist, given the *apparent* agreement among five members of this Court as to this Court's authority to impose some form of comparative fault in the face of the legislature's affirmative refusal to do so, the form of comparative fault to adopt and the wisdom of exercising that authority. In his opinion for the Court in *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983), Judge Welliver attempted to resolve the dilemma posed in his concurring opinion in *Steinman* by embracing model *legislation*—the Uniform Comparative Fault Act.

But for three words, "insofar as possible", *Gustafson* at 15, this Court might have attained the systematic, all-inclusive solution which Judge Welliver considered essential to the adoption of comparative fault in his *Steinman* concurrence. It is by now obvious, however, that "insofar as possible" is the critical phrase in *Gustafson.* One could hardly foresee that the phrase "insofar as possible" in *Gustafson* could hold such diverse meanings for the members of the *Gustafson* Court who embraced it. The great *ad hominem* verbal battle which is now joined in this case—which produces far more sound than light—finds its genesis in those words.

In an age of judicial trespass, what is "possible" for a court can scarcely be pre-

---

**1.** Had I been a member of the Court when *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983) was decided, I would have joined the dissenting opinions of Judges Gunn and Rendlen. ("I believe the imposition of comparative negligence is purely a matter for legislative ac-

tion.... I believe we have intruded into an area which belongs to the legislature.... I believe the imposition of comparative negligence or fault is not a matter for judicial fiat....") *Id.* at 29 (Gunn, J. dissenting).

dicted. The *Gustafson* majority had, after all, presumed both to define its power to do what the legislature would not and to resolve in a single case all of the potential questions raised by the adoption of comparative fault.[2] Nevertheless, the language "insofar as possible" betrays an ambiguity even as to the *Gustafson* majority's concept of the scope of their holding. That ambiguity is not limited to the issues before us in this case.

A fundamental principle remains. The all-inclusive, systematic treatment of the comparative fault issue for which Judge Welliver called in *Steinman* is essential if we are to avoid chaos in the law. As this case and *Gustafson* conclusively prove, however, an all-inclusive, systematic *judicial* solution is neither appropriate nor possible. It is not appropriate because it is the inherent function of the court to confine its judgment to the questions actually before it. It is not possible because of the "inability to find agreement among ... my brothers of this court as to the exact form [and scope] of 'comparative negligence' best suited to our social and economic needs...." *Steinman, supra* at 294 (Welliver J. concurring).

Broad policy issues are the legislature's business. The question of comparative fault is, and has always been, one for the General Assembly.

Principles of *stare decisis*, at least as they apply in matters of common law, dictate that *Gustafson* not be overruled. Consistent with my view that comparative fault is a legislative question, however, I would not extend the scope of comparative fault beyond the unambiguous teachings of

*Gustafson.* Because *Gustafson* does not address the applicability of comparative fault to products liability actions without ambiguity, I am able to do no more than concur in the result reached in the principal opinion.

DONNELLY, Judge, dissenting.

Today, the Court rejects the concept of comparative fault and permits "plaintiff's own conduct * * * to escape unexamined, and as to that share of plaintiff's damages which flows from his own fault * * * [holds that] * * * it should * * * be borne by others." *Daly v. General Motors Corporation*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162, 1169 (1978).

This comes as no surprise. In early 1983 it was apparent that *fault* was targeted for elimination as a component in the tort equation.[1] This is unfortunate. In my view, the Court distorts the judicial process when it gives to one what belongs to another.

In *Keener v. Dayton Electric Mfg. Co.*, 445 S.W.2d 362 (Mo.1969), this Court "recognized the need to allow injured consumers or remote parties the ability to sue suppliers, sellers or manufacturers absent the technical requirements of privity in a contract action or without the need to prove negligence in a tort action." *Sharp Brothers Contracting Company v. American Hoist & Derrick Company*, 703 S.W.2d 901, 903 (Mo. banc 1986) (Welliver, J., concurring). In *Keener*, the Court adopted the rule of strict liability in tort stated in 2 Restatement, Law of Torts, Second, § 402A.

---

2. It can scarcely be ignored that the application of comparative fault was neither briefed nor argued to the trial court, the Court of Appeals or this Court by the parties in *Gustafson*. The majority simply decided that it would no longer wait for the legislature. "We are now past the time when we should have resolved the uncertainty surrounding comparative fault...." *Id.* at 15.

1. Of course, the people should, and will, make their own judgments as to the accuracy of this statement. The evidence is now in the books. *See Virginia D. v. Madesco Investment Corp.*, 648

S.W.2d 881 (Mo. banc 1983); *Johnson v. Pacific Intermountain Express Co.*, 662 S.W.2d 237 (Mo. banc 1983); *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434 (Mo. banc 1984); *Fowler v. Park Corporation*, 673 S.W.2d 749 (Mo. banc 1984); *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. banc 1986); and *Jackson v. Ray Kruse Construction Company, Inc.*, 708 S.W.2d 664 (Mo. banc 1986).

This is not a day for the sounding of trumpets. The Missouri Court Plan could have fulfilled its promise of equal treatment under the law. It deserved a better fate.

In *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo. banc 1977), the Court expanded the *Keener* holding to include design defects.

In *Elmore v. Owens-Illinois Glass Co., Inc.*, 673 S.W.2d 434 (Mo. banc 1984), the Court effectually excised the words "unreasonably dangerous" from the *Keener* model.

In *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. banc 1986), the Court effectually excised the words "use reasonably anticipated" from the *Keener* model.

The changes wrought can be illustrated by their practical effect on our Missouri Approved Jury Instructions.

The holding in *Keener* required the giving of MAI 25.04, which reads as follows:

Your verdict must be for plaintiff if you believe:

First, defendant sold the (*describe product*) in the course of defendant's business, and

Second, the (*describe product*) was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the (*describe product*) was used in a manner reasonably anticipated, and

Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the (*describe product*) was sold.

*[unless you believe plaintiff is not entitled to recover by reason of Instruction Number —— (*here insert number of affirmative defense instruction*)].

The holding in *Keener* also required the giving of MAI 32.23, which reads as follows:

Your verdict must be for defendant if you believe:

First, when the (*describe product*) was used, plaintiff knew of the danger as submitted in Instruction[s] Number _____ [and _____] and appreciated the danger of its use, and

Second, plaintiff voluntarily and unreasonably exposed himself to such danger, and

Third, such conduct directly caused or directly contributed to cause any damage plaintiff may have sustained.

The holding in *Elmore* required that MAI 25.04 be modified to read as follows:

Your verdict must be for plaintiff if you believe:

First, defendant sold the (*describe product*) in the course of defendant's business, and

Second, the (*describe product*) was then in a defective condition * * * when put to a reasonably anticipated use, and

Third, the (*describe product*) was used in a manner reasonably anticipated, and

Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the (*describe product*) was sold.

*[unless you believe plaintiff is not entitled to recover by reason of Instruction Number —— (*here insert number of affirmative defense instruction*)].

The holding in *Nesselrode* required that MAI 25.04 be modified further to read as follows:

Your verdict must be for plaintiff if you believe:

First, defendant sold the (*describe product*) in the course of defendant's business, and

Second, the (*describe product*) was then in a defective condition * * *, and

Third, the (*describe product*) was used * * *, and

Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the (*describe product*) was sold.

*[unless you believe plaintiff is not entitled to recover by reason of Instruction Number —— (*here insert number of affirmative defense instruction*)].

Today, the majority eliminates the giving of MAI 32.23 and requires that MAI 25.04 be modified further to read as follows:

Your verdict must be for plaintiff if you believe:

First, defendant sold the (*describe product*) in the course of defendant's business, and

Second, the (*describe product*) was then in a defective condition * * *, and

Third, the (*describe product*) was used * * *, and

Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the (*describe product*) was sold.

    *     *     *     *     *     *

And, given the holding in *Jackson v. Ray Kruse Construction Company, Inc.*, 708 S.W.2d 664 (Mo. banc 1986), we can reasonably anticipate that MAI 25.04 will be modified further in the near future to read as follows:

Your verdict must be for plaintiff if you believe:

First, defendant sold the (*describe product*) in the course of defendant's business, and

Second, the (*describe product*) was then in a defective condition * * *, and

Third, the (*describe product*) was used * * *, and

Fourth, plaintiff was damaged * * *.

After all the twists and turns since *Keener* and *Anderson v. Cahill*, 528 S.W.2d 742, 749 (Mo. banc 1975) (Donnelly, J., concurring), I continue to believe that this Court should apply to negligence and products liability cases the system of pure comparative fault suggested in *Steinman v. Strobel*, 589 S.W.2d 293, 296, 297 (Mo. banc 1979) (Donnelly, J., dissenting).

The principal opinion is fundamentally flawed because the majority refuses to acknowledge the difference articulated in *Keener* between *negligence* and *fault*. After *Keener*, negligence was not a consideration in products liability cases. After *Keener*, *fault* in products liability cases consisted of acts or omissions that subject a person to strict tort liability; and the essential question which bore on *fault* in such cases was submitted under MAI 25.-04: Did defendant sell a product in a defective condition unreasonably dangerous when put to a reasonably anticipated use? The question of contributory *fault* was submitted under MAI 32.23. Mention of negligence in a products liability case is obfuscation.

I would return to *Keener* (and its inclusion of *fault* in the strict liability in tort equation) and would adopt a system of pure comparative fault, as follows:

I. *Effect of Contributory Fault.*

(a) In an action based on fault to recover damages for injury or death to person or harm to property, any contributory fault chargeable to a claimant diminishes proportionately the amount awarded as compensatory damages for any injury attributable to that claimant's contributory fault, but does not bar recovery. This rule applies whether or not the claimant's contributory fault heretofore constituted a defense or was disregarded under applicable legal doctrines, such as the last clear chance and humanitarian doctrines.

(b) "Fault" includes acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others or that subject a person to strict tort liability. The term also includes breach of warranty, unreasonable assumption of risk not constituting an enforceable express consent, misuse of a product for which the defendant otherwise would be liable, and unreasonable failure to avoid an injury or to mitigate damages. Legal requirements of causal relation apply both to fault as the basis for liability and to contributory fault.

II. *Apportionment of Damages.*

(a) In all actions involving fault of more than one person, the court, unless otherwise agreed by all parties, shall instruct the jury to make findings, indicating:

(1) the amount of damages each claimant would be entitled to recover if his contributory fault is disregarded; and

(2) the percentage of the total fault that is allocable to each tort-feasor-party, including claimants. For this purpose the court may determine that two or more persons are to be treated as a single party. The percentages shall total 100%.

(b) A tort-feasor's percentage of fault shall be taken into consideration in determining the total fault even though judgment cannot be entered against him. Where the evidence warrants it, the court shall add that person as a party solely for the purpose of determining and allocating fault upon a 100% basis.

(c) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of the person and the extent of the causal relation between the conduct and the damages claimed.

(d) The court shall determine the award of damages to each claimant, and shall state in the judgment the amount which represents each party's share of the obligation to each claimant in accordance with the respective percentages of fault found, holding each party responsible by judgment only for his apportioned amount. There shall be no set-off between claimants.

(e) The court shall not enter judgment against a tort-feasor-party, in accordance with the percentage of his fault found, if the claim against him is barred by release or by law.

In my view, a court should strive for fairness "in assigning rights and duties and in defining the appropriate division of social advantages." J. Rawls, *A Theory of Justice* 10 (1971). Otherwise, it can degenerate "into interest government, a government of jobbers enriching * * * their friends * * * and ruining itself." A. Bickel, *The Morality of Consent* 23 (1975).

I dissent.

## WELLIVER, Judge, dissenting.

I respectfully dissent.

The issue in this case is whether the comparative fault doctrine is applicable in strict products liability cases.[1] The majority alleges that this is an issue of "first impression" in Missouri. I would respectfully suggest that a more accurate description of the issue in the case[2] is whether *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983) now shall be overruled to the extent that it applies to strict products liability cases.[3]

In *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983), this Court stated that "[i]nsofar as possible this and future cases shall apply the doctrine of pure comparative fault in accordance with the Uniform Comparative Fault Act [(U.C.F.A.)] §§ 1–6, 12 U.L.A.Supp. 35–45 (1983), a copy of which, with commissioners' comments, is appended to this opinion as Appendix A." 661 S.W.2d at 15–16. The U.C.F.A. § 1(a) sets forth the comparative fault standard by providing "[i]n an action based on fault ... any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for an injury attributable to the claimant's contributory fault, but does not bar recovery." The U.C.F.A. § 1(b) clearly indicates that U.C.F.A. § 1(a) applies in strict products liability cases by providing that " 'Fault' includes acts or omissions that ...

---

**1.** The strict products liability standard of the Restatement (Second) of Torts § 402A was adopted by this Court in *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo. 1969).

**2.** The identical issue is also raised in *Barnes v. Tools & Machinery Builders, Inc.,* 715 S.W.2d 518 (Mo. banc 1986), decided concurrently herewith.

**3.** *Lippard v. Houdaille Industries, Inc.,* 715 S.W.2d 506 No. 49226 (Mo.App. Dec. 3, 1985), a copy of which is attached and appended hereto as an appendix to this dissent and made a part hereof. *See also Barnes v. Tools & Machinery Builders, Inc.,* No. 49180 (Mo.App.Dec. 3, 1985); *Gearhart v. Uniden Corporation of America,* 781 F.2d 147 (8th Cir.1986).

subject a person[4] to strict tort liability." This result is logical since " 'fault' clearly encompasses much more than mere negligence." Anderson & Bruce, Recent Developments in Missouri Tort Laws: Gustafson v. Benda, 52 U.M.K.C.L.R. 538, 546 (1984). Clearly, the majority in *Gustafson* in stating that "future cases shall apply the doctrine of pure comparative fault in accordance with the Uniform Comparative Fault Act, §§ 1–6, 12 U.L.A.Supp. 35–45 (1983), a copy of which, *with commissioner's comments*, is appended to this opinion as Exhibit A", 661 S.W.2d at 15–16 (footnote omitted) (emphasis added), intended that the comments be as much guidance in future cases as the six paragraphs of the "Act" itself. Those comments specifically state:

> Although strict liability is sometimes called absolute liability or liability without fault, it is still included.... Putting out a product that is dangerous to the user or the public or engaging in an activity that is dangerous to those in the vicinity involves a measure of fault that can be weighed and compared, *even though it is not characterized as negligence.*

*Gustafson*, 661 S.W.2d at 19 (Appendix A) (emphasis added).

The current majority alleges and assumes that the "[i]nsofar as possible" language of *Gustafson* indicates that the U.C. F.A. should be applied only where it does not violate prior Missouri common law principles. Were this so, *Gustafson* would have been a nullity and its adoption either an exercise in futility or a gigantic fraud on the bench, bar and the public. No one could have recognized more clearly our purpose to supplant common law doctrines and prior judicially promulgated doctrines than did Billings, J., stating in his concurring opinion:

> Historically, contributory negligence, last clear chance, and humanitarian negli-

gence, were born by judicial decisions. By judicial decision we bury them.

*Gustafson*, 661 S.W.2d at 28. (Billings, J., concurring). Strict products liability was also born in our case law. *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362 (Mo.1969).

In *Gearhart v. Uniden Corporation of America*, 781 F.2d 147 (8th Cir.1986), the Eighth Circuit came to a similar conclusion, stating "given the sweeping language of *Gustafson*, as well as its specific call for a comprehensive system, we believe that the Missouri Supreme Court intended to apply the principles of the [Uniform Comparative Fault] Act as broadly as possible to Missouri law, without regard to the intricacies of pre-*Gustafson* case law." *Gearhart* 781 F.2d at 150. *See also Faries v. Atlas Truck Body Mfg. Co.*, 797 F.2d 619 (8th Cir.1986).

What the *Gustafson* majority meant by the "insofar as possible" language was made crystal clear when, by footnote 10, it excepted from the effect of the opinion the then recently amended statute, § 537.060, RSMo Cum.Supp.1984, as it related to settlements and releases in comparative fault cases, and by its recognition in the following sentence that the opinion did not supplant the statute as it related to joint and several liability. *Gustafson*, 661 S.W.2d at 16.

Not only the clear meaning of both the body of the U.C.F.A. and the Commissioners' Comments adopted therewith, but also the basic principles of the concept of comparative fault dictate its application to the strict products liability cases. In *Gustafson*, this Court recognized the "fairness and justice" of comparative fault, as opposed to "fairly inflexible rules of tort law." 661 S.W.2d at 13. The Court included a passage by Dean Prosser stating:

> It is still no more reasonable to charge the defendant with the plaintiff's share of the consequences of his fault than to charge the plaintiff with the defendant's;

*Monckton*, 308 Mo. 641, 274 S.W. 404 (1925).

---

**4.** The term "person" includes corporations. § 351.015, RSMo Cum.Supp.1986; *Bassen v.*

and it is no better policy to relieve the negligent plaintiff of all responsibility for his injury than it is to relieve the negligent defendant.

*Gustafson*, 661 S.W.2d at 13, quoting H. Woods, "The Negligence Case: Comparative Fault 14–15 (1978), quoting Prosser, Comparative Negligence, 51 Mich.L.Rev. 465, 474 (1953). The importance of fairness and justice that prompted this Court to adopt comparative fault in *Gustafson* is no less compelling in the strict products liability setting since

> [t]he primary reason that the plaintiff's conduct should be considered in products liability litigation is the unfairness of requiring defendant, or society through the risk-spreading mechanism, to pay for injuries caused by the plaintiff's wrongdoing. Because the plaintiff is often an active participant in the injury-producing incident, there is no reason not to examine the role his actions played in the incident.

Gershonowitz, Comparative Causation as an Alternative to, Not a Part of, Comparative Fault in Strict Products Liability, 30 St. Louis U.L.J. 483, 485–86 (1986) (citation and footnotes omitted).

The Court in *Gustafson* specifically stated that "fairness and justice can best be achieved through a broader application of [the comparative fault] doctrine." 661 S.W.2d at 15. The Court specifically found

that "[the comparative fault doctrine] is workable and will fulfill the needs of our complex modern society." 661 S.W.2d at 15.

If the new and current majority wishes to deny the applicability of comparative fault in strict products liability cases, it should admit that it is overruling *Gustafson* to that extent.

Even if this question were one of first impression as the majority alleges, and we were not bound by *stare decisis* to follow *Gustafson*, principles of fairness would demand the application of comparative fault in strict products liability since "[i]n the absence of apportionment, some manufacturers bear the total expense of accidents for which others are partly to blame, while other manufacturers totally escape liability even though they have sold defective products. Either result is unacceptable." *Duncan v. Cessna Aircraft Co.* 665 S.W.2d 414, 425 (Tex.1984).

The overwhelming majority of authority, both judicial and academic, recognizes the wisdom of the application of comparative fault in strict products liability cases.

While twenty-eight of the more influential jurisdictions, including the United States, California, Illinois, New York and Texas, have applied comparative fault or negligence to strict products liability, only six jurisdictions have held the contrary.[5]

5. The following jurisdictions have applied comparative fault or negligence to strict products liability:

*Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.,* 565 F.2d 1129 (9th Cir.1977) (federal admiralty cases); *Butand v. Suburban Marine & Sporting Goods, Inc.,* 555 P.2d 42 (Alaska 1976); Ark.Stat.Ann. §§ 27–1763 to 27–1765 (1979); *Daly v. General Motors Corp.,* 20 Cal.3d 725, 575 P.2d 1162, 144 Cal.Rptr. 380 (1978); *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla.1976); *Kaneko v. Hilo Coast Processing,* 65 Hawaii 447, 654 P.2d 343 (1982); *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.,* 411 F.Supp. 598 (D.Idaho 1976) (applying Idaho law); *Coney v. J.L.G. Industries, Inc.,* 97 Ill.2d 104, 73 Ill.Dec. 337, 454 N.E.2d 197 (1983); *Kennedy v. City of Sawyer,* 228 Kan. 439, 618 P.2d 788 (1980); *Bell v. Jet Wheel Blast, Division of Erwin Ind.,* 462 So.2d 166 (La.1985); Me.Rev. Stat.Ann. tit. 14, § 156 (1964); Mich.Comp.Laws § 600.2949 (Supp.1982); *Busch v. Busch Con-*struction, *Inc.,* 262 N.W.2d 377 (Minn.1977); *Zahrte v. Sturm, Ruger & Co.,* 661 P.2d 17 (Mont.1983); *Thibault v. Sears, Roebuck & Co.,* 118 N.H. 802, 395 A.2d 843 (1978); *Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 406 A.2d 140 (1979); *Marchese v. Warner Communications, Inc.,* 100 N.M. 313, 670 P.2d 113 (N.M. Ct.App.1983), *cert. denied,* 100 N.M. 259, 669 P.2d 735 (1983); N.Y.Civ.Prac.Law § 1411 (McKinney 1976); *Mauch v. Manufacturers Sales & Service, Inc.,* 345 N.W.2d 338 (N.D. 1984); *Wilson v. B.F. Goodrich,* 292 Or. 626, 642 P.2d 644 (1982); *Baccelleri v. Hyster Co.,* 287 Or. 3, 597 P.2d 351 (1979); *McPhail v. Culebra,* 598 F.2d 603 (1st Cir.1979) (applying Puerto Rico law); *Norman v. Fisher Marine, Inc.,* 672 S.W.2d 414 (Tenn.1984), *app. den.,* 5–21–84; *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984); *Mulherin v. Ingersoll-Rand Co.,* 628 P.2d 1301 (Utah 1981); *Murray v. Fairbanks Morse,* 610 F.2d 149 (3rd Cir.1979) (applying Virgin Islands

The reason for the differing results is succinctly set forth by the Supreme Court of Hawaii: "In short, those who oppose the merger [of comparative negligence or fault with strict products liability] believe that neglience and strict liability are different theories and therefore are not compatible. Those jurisdictions that are in favor of the merger argue that fairness and equity are more important than semantic consistency." *Kaneko v. Hilo Coast Processing*, 65 Hawaii 447, 654 P.2d 343, 351 (1982). *See, e.g.*, for application: Carestra, The Interaction of Comparative Negligence and Strict Products Liability—Where Are We?, 47 Ins.Com.J. 53 (1980); Fischer, Products Liability—Applicability of Comparative Negligence, 43 Mo.L.Rev. 431 (1978); Gershonowitz, Comparative Causation as an Alternative to, Not a Part of, Comparative Fault in Strict Products Liability, 30 St. Louis U.L.J. 483 (1986); Schwartz, Strict Liability and Comparative Negligence, 42 Tenn.L.R. 171 (1974). Against application: Twerski, The Use and Abuse of Comparative Negligence in Products Liability, 10 Ind.L.Rev. 797 (1977).

I agree with the Supreme Court of California that

"[O]ur reason for extending a full system of comparative fault to strict products liability is because it is fair to do so. The law consistently seeks to elevate *justice and equity* above the exact contours of a mathematical equation. We are con-

vinced that in merging the two principles what may be lost in symmetry is more than gained in *fundamental fairness.*" *Daly v. General Motors Corp.*, 20 Cal.3d 725, 742, 575 P.2d 1162, 1172, 144 Cal.Rptr. 380, 390 (1978) (emphasis added). It is the very same concern for the "elevat[ion] of justice and equity" that prompted this Court to adopt *Gustafson.*

In their covert overruling of *Gustafson*, the majority disregards the long-standing principles of justice and fairness which *Gustafson* embodied.

I find no error in the circuit court instructing the jury to compare fault in light of *Gustafson* and would, therefore, affirm the judgment.

### EPILOGUE—TO GUSTAFSON

The fair, just, young *Gustafson* lies mortally wounded and dying behind the curtain which has now been drawn on this day's performance. You, dear audience of readers, have read the eloquent words of each of the performers, words which are now yours to judge as legal scholarship, legalese or perhaps just legal gobbledygook.[6] But, pray thee not conclude that our brothers below speak with more enlightenment than we.

In these brief moments I propose to depart the usual legal model and form to address plain words [7] to some of the subtle-

law); Wash.Rev.Code Ann. §§ 4.22.005 to 4.22.015 (Supp.1982); *Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854 (W.Va.1982); *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967).
The following jurisdictions have refused to apply comparative fault or negligence in strict products liability cases:
*Kinard v. Coats Co.*, 37 Colo.App. 555, 553 P.2d 835; *but see Welch v. F.R. Stokes, Inc.*, 555 F.Supp. 1054 (D.Colo.1983) (interpreting Colo. Rev.Stat. § 13–21–406 (Supp.1982)); *Melia v. Ford Motor Co.*, 534 F.2d 795 (8th Cir.1976) (applying Nebraska law); *Young's Machine Co. v. Long*, 100 Nev. 692, 692 P.2d 24 (1984), Nev. Rev.Stat. § 41.141 subd. 1; *Kirkland v. General Motors Corp.* 521 P.2d 1353 (Okla.1974); *Roy v. Star Chopper Co.*, 584 F.2d 1124 (1st Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979) (applying Rhode Island law); *Klung v. Keller Industries, Inc.*, 328 N.W.2d 847

(S.D.1982); *Smith v. Smith*, 278 N.W.2d 155 (S.D.1979).

6. "Judges should be judged on their opinions", a statement frequently made by many of the members of our cast.

7. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.
*Bridges v. State of California*, 314 U.S. 252, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941), Mr. Justice Black (footnote omitted).

ties of our performance, in tribute, I hope, to the short and frustrated life of *Gustafson*.

I approach my task by tendering for your view and consideration the prophetic words of a distinguished member of the cast that there were "great prospects for the Decade ahead" in this Court.

In early 1983, the then Chief Justice Rendlen suggested that recent personnel changes in our cast "signals a new beginning—it heralds great prospects for the Decade ahead." [8]

My search to identify these "great prospects", unlike my search in *State v. Haggard*, 619 S.W.2d 44, 55 (Mo. banc 1981), which Chief Justice Rendlen likened to " ... Quixana's [Cervantes, 1605] Don Quixote de Lamancha's search for giants that became a comic tilt with windmills", in this instance, has been more productive. Among the "great prospects" of the first three years of this decade I found a case holding that the simple word "accident" as used in the workers compensation law means "any job related injury" [9]; a case holding that a person can recover damages for injury without there being impact [10]; a case holding that innkeepers hereafter are to be insurors of the safety of persons coming on their premises [11]; a case holding that a heart attack on the job is an accident under the workers compensation law [12]; a case holding that suits for damages may be brought for the wrongful death of a viable fetus [13]; a case holding that liability can be based on "appearances (of authority), not on actualities" [14]; a case holding that plaintiffs in malpractice actions can obtain theretofore privileged information from hospital peer group records [15]; and, a case holding that one entrusting or leasing personal property to another can be held liable for the acts of an employee of the entrustee or lessee who may have injured another.[16]

The departure to the Federal Bench of one of those described as having the "Bond

8. Taken from a portion of the text of "Report On The Supreme Court In Transition," by then Chief Justice Rendlen addressing the Tenth Annual Bench-Bar Conference of the Kansas City Bar Association, Marriott's Tan-Tar-A Resort, April 8, 1983. The relevant portion of the address is set forth in full.

   Another monumental development in the life of the Court has been the personnel changes. Three new men came to the Court in late 1982. This was the first time since 1935 three new members have joined the Court in one year. They represent not only fresh points of view but are bright and effective. The appointment of Judge Blackmar in December marked something of a milestone, in that the entire membership of the Court is composed of post World War II lawyers and all of us have had military service. Further, while the three new men and I come from different parts of the State and had somewhat different backgrounds, *the four of us have a Bond in common.*

   Charles Blackmar has been aptly described as our living, walking Lexis-we may well decide to discontinue the Lexis terminal at the Supreme Court and substitute Charley for the service. He is joined by two especially capable men from the Courts of Appeal-Judge George Gunn from St. Louis and Judge William Billings from Springfield who collectively represent 17 years of appellate court experience. Their accomplishments speak for themselves and appear in their published opinions—they are prodigious workers.

   Their coming to the Court signals a new beginning—it heralds great prospects for the Decade ahead. (Billings's Mule story) The term collegiality now has a special meaning on our Court and serving as Chief Justice in such circumstance has become a true pleasure.
   (Emphasis added).

9. *Wolfgeher v. Wagner Cartage Service,* 646 S.W.2d 781 (Mo. banc 1983).

10. *Bass v. Nooney,* 646 S.W.2d 765 (Mo. banc 1983).

11. *Virginia D. v. Madesco Investment Co.,* 648 S.W.2d 881 (Mo. banc 1983).

12. *Wynn v. Navajo Freight Lines,* 654 S.W.2d 87 (Mo. banc 1983).

13. *O'Grady v. Brown,* 654 S.W.2d 904 (Mo. banc 1983).

14. *Johnson v. P.I.E.,* 662 S.W.2d 237, 246 (Mo. banc 1983).

15. *Chandra v. Sprinkle,* 678 S.W.2d 804 (Mo. banc 1984).

16. *Fowler v. Park Corporation,* 673 S.W.2d 749 (Mo. banc 1984).

in common," [17] set me in great fear that my search for the "great prospects" might thereafter be in vain, and, in fact might become a "comic tilt with windmills." But such was not destined to be. Another of our cast soon to become Chief Justice Andrew Jackson Higgins, joined in the continuing production of the "great prospects," by authoring a case which held that products liability law in Missouri does not recognize state of the art defenses [18]; by authoring an opinion that affirmed a $15 million verdict and abolished the doctrine of remittitur and directed that Missouri appellate courts should no longer look at the size of verdicts [19]; and by concurring separately in an opinion holding that the owner of property could be held liable for the injury caused by a trespasser leaving the bicycle on which he was riding by flying through the air and striking and injuring another.[20] Truly, those of the "Bond in common" have made come to pass the teachings of the prophet by the creation of these "great prospects", by M.A.T.A. thought to be the coming of the Great society, and by others, thought to be this Court's contribution to the Tort Crisis.

Had thou but been apprised honestly, directly and forthrightly as to the nature, extent, effect and social cost of the "great prospects" bestowed by the majority having the "Bond in common", or, had thou been dispensed all of the "great prospects" in a single dose of medicine, and not as the easier digested spoonful at a time, perhaps you would have been better readied for this penultimate of the "great prospects"—today's decree that the deep pocket be reserved for the benefit of plaintiffs and their lawyers, even if the deep pocket be

but a fraction of a percent the cause of the fault. And, I observe, the early and untimely demise of our friend, *Gustafson.*

I am aware of the growing length of this epilogue, the lateness of the hour, and, that he who would deliver the epilogue should send you forth in good spirits and not in mourning, frustration and depression. So fear not your escalating insurance premiums resulting from these "great prospects," or your inability to purchase insurance, or the fact you may be forced to close your business or abandon the pursuit of your profession. Have confidence that the Missouri General Assembly will deliver you from the Sargasso Sea of the crisis of tort (1) by passing a simple statute to place products liability litigation back within the comparative fault contemplated by *Gustafson;* (2) by repealing § 537.060, RSMo Cum.Supp.1986, relating to joint and several liability and settlement and releases in comparative fault cases and providing in lieu thereof that the released parties remain in the litigation for the sole purpose of apportioning their percentage of the fault; and (3) by abrogating joint and several liability.[21] I have total confidence that the Missouri Legislature will never leave you to the drastic remedy of California's recent Proposition 51,[22] nor has it ever been their bent to leave such matters to the decision of the Federal Congress.

With these small acts, all of which can be accomplished in a single, simple legislative enactment, the General Assembly can bestow upon you the fairest and most just tort system of any state in America, and, may again breathe life into the dying *Gustafson.*

17. Hon. George F. Gunn, Judge of the United States District Court, Eastern District of Missouri.

18. *Elmore v. Owens-Illinois,* 673 S.W.2d 434 (Mo. banc 1984) (Higgins, J.).

19. *Firestone v. Crown Center Redevelopment Corp.,* 693 S.W.2d 99 (Mo. banc 1985).

20. *Jackson v. Ray Kruse Constr. Co.,* 708 S.W.2d 664–669 (Mo. banc 1986) (Blackmar, J.) (Higgins, C.J., concurring in separate opinion).

21. Unless joint and several liability be by the Legislature *affirmatively* abrogated, another of the "great prospects for the Decade" might be a future court decision reinstating joint and several liability as having been born in the common law. *See* Comment, Abrogation of Joint and Several Liability: Should Missouri Be Next in Line?, 52 U.K.C.L.R. 72 (1983).

22. California Primary Election June 17, 1986.

As I withdraw behind the curtain tightly drawn upon the secrecy of the subtleties of the preparations for our next performance; I bid thee God Speed and a restful night, dear patrons of our art.

Go now my friend, depart the play,

"Bond[s] in common", may have their day,

Fairness and justice have here come to stay

And *Gustafson*, yet, may prevail in this fray.

## APPENDIX A

SNYDER, Judge.

This case presents the novel question of the application of the comparative fault doctrine, *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983), to actions based on strict liability.

The jury found total damages of $75,-000.00 and assessed fifty percent of the fault to the plaintiff. The trial court judgment was in favor of the plaintiff in the sum of $37,500.00. He appeals.

Before *Gustafson*, contributory negligence was not a defense in strict liability cases. The negligence of the plaintiff was irrelevant. The question now arises: since *Gustafson*, should the comparative fault of a plaintiff be considered in awarding damages in a case based on strict liability in tort? We hold that it should and affirm the trial court judgment.

Appellant's hand was seriously injured when it came into contact with the cutter blades of a jointer machine manufactured by respondent. Appellant alleged the machine was defective.

Appellant asserts error in the submission of Instruction No. 8 for the reason, among others, that comparative fault is not a valid defense in an action based on strict liability.

Instruction No. 8 to the jury read:

You must assess a percentage of fault to plaintiff if you believe:

First, plaintiff failed to look where he was placing his right hand at the time of his accident;

Second, plaintiff knew or by the exercise of ordinary care could have known of the danger from the cutter head, and

Third, plaintiff was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause any damage plaintiff may have sustained.

The term "negligent" or "negligence" as used in this instruction means the failure to use that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances.

The phrase "ordinary care" as used in this instruction means that degree of care that would be reasonable in plaintiff's situation.

This is a case of first impression in Missouri since the adoption of the comparative fault doctrine and requires an extended discussion. We have been aided in our analysis by the excellent briefs of both parties and by the amicus curiae brief of the Missouri Association of Trial Attorneys.

Missouri adopted the pure comparative fault doctrine in *Gustafson v. Benda*, *supra*, saying at page 15: "[i]nsofar as possible this and future cases shall apply the doctrine of pure comparative fault in accordance with the Uniform Comparative Fault Act, §§ 1–6, 12 U.L.A.Supp. 35–45 (1983)." A copy of the uniform act was appended to the *Gustafson* opinion.

Fault is described in § 1(b) of the Uniform Comparative Fault Act (U.C.F.A.) to include "acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, *or that subject a person to strict tort liability*." (Emphasis added.)

The Commissioners' Comment to § 1, in which is described the effect of contributory fault, contains this language:

Although strict liability is sometimes called absolute liability or liability without fault, it is still included. Strict liabili-

ty for both abnormally dangerous activities and for products bears a strong similarity to negligence as a matter of law (negligence per se), and the factfinder should have no real difficulty in setting percentages of fault. Putting out a product that is dangerous to the user or the public or engaging in an activity that is dangerous to those in the vicinity involves a measure of fault that can be weighed and compared, even though it is not characterized as negligence.

. . . . .

Contributory fault diminishes recovery whether it was previously a bar or not, as, for example, in the case of *ordinary contributory negligence in an action based on strict liability or recklessness.* (emphasis added).

U.C.F.A. § 1(b) Commissioners' Comment (1977) (amended 1979).

The quoted language from *Gustafson v. Benda, supra,* the U.C.F.A. and the Commissioners' Comments seem to make it plain that the comparative fault doctrine should be applied to strict liability actions in Missouri. Because the question of comparative fault as it applies to strict liability actions is a novel and important question which will have significant and pervasive effects on the law of strict liability, however, other reasons for our ruling should be analyzed in some detail.

Before the comparative fault doctrine was adopted in Missouri, contributory negligence was not a valid defense in a strict liability action. *Keener v. Dayton Electric Manufacturing Company,* 445 S.W.2d 362, 365 [4, 5] (Mo.1969). The Supreme Court in *Keener* said, "[c]ontributory negligence, as we ordinarily apply it, is not a defense to strict liability." The court went on to say, however, that what has been described in the cases as "assumption of risk," although the court did not use those words, is a defense to strict liability. *Id.*

There have been no cases in Missouri which have ruled on the question of the application of the comparative fault doctrine to strict liability cases, but there are many cases and some statutory enactments in other jurisdictions.

There are three types of comparative fault systems: pure, modified, and slight-gross. In the pure system, a plaintiff's contributory negligence reduces his damages in proportion to his fault. *Gustafson v. Benda, supra* at 15; *Kaatz v. State,* 540 P.2d 1037, 1049 (Alaska 1975); *Li v. Yellow Cab Company of California,* 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975); *Hoffman v. Jones,* 280 So.2d 431, 438 (Fla.1973).

In the modified system, the plaintiff's contributory negligence does not bar recovery so long as it remains below a specified proportion of the total fault. In some of the states, if the plaintiff is fifty percent at fault, he may not recover. Utah Code.Ann. § 78–27–37 (1983), *Mulherin v. Ingersoll-Rand Company,* 628 P.2d 1301, 1304 (Utah 1981); *Star Furniture Co. v. Pulaski Furniture Co.,* 297 S.E.2d 854, 862 (W.Va. 1982). In others he may not recover if his fault is more than fifty percent or if it exceeds the fault of the defendants. N.J. Stat.Ann. §§ 2A:15–5.1—15–5.3 (West 1984); *Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 406 A.2d 140, 146 (1979); Or.Rev.Stats. § 18.470 (1983), *Sandford v. Chevrolet Division of General Motors,* 292 Or. 590, 642 P.2d 624, 635 (1982).

Only two states, Nebraska and South Dakota, have the slight-gross system in which the plaintiff is barred from recovering unless his negligence is "slight." *In re Estate of Tichota,* 190 Neb. 775, 212 N.W.2d 557, 560 (Nebraska 1973); *American State Bank v. List-Mayer,* 350 N.W.2d 44, 47 (S.D.1984).

It is beyond the scope of this opinion to analyze these systems, but it is not difficult to hypothesize fact situations which would give rise to significant problems under any of the three.

One problem with the pure system of comparative fault adopted by Missouri arises when a party who is guilty of the proportionally greater fault may recover a greater absolute amount of damages than

the other party whose fault was much less in degree. This might happen if a plaintiff's injuries were slight and a counterclaiming defendant's injuries much more serious. If the plaintiff's damages are assessed at $10,000.00 and he is ten percent at fault, he will recover $9,000.00. If the counterclaiming defendant's injuries are assessed at $300,000.00 in the same case, he will obtain damages from the plaintiff of $30,000.00, although the defendant was ninety percent at fault and the plaintiff only ten percent. In theory, however, the result is not unfair since each party pays his share of the loss which he has caused.

Of the 44 states which had adopted comparative fault systems as of early 1985, 23 have applied the comparative fault doctrine to actions brought based on strict liability in tort, either by legislation or by judicial decision.[1] In three other states, Idaho, Mississippi and Montana, federal courts have said that under state law, comparative fault applies to strict liability actions.[2]

The best opinion from another jurisdiction which sets forth the reasons for applying the principles of comparative fault to actions founded on strict liability is *Daly v. General Motors Corporation*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978). The California Supreme Court points out that strict liability has never meant absolute liability and that the manufacturer of a product does not become the insurer of the safety of the product's user.

The theme that strict liability does not mean absolute liability occurs frequently in the cases which deal with this subject. *Stevens v. Durbin-Durco, Inc.*, 377 S.W.2d 343, 346 (Mo.1964); *Daly v. General Motors Corporation*, 114 Cal.Rptr. at 384, 575 P.2d at 1166; *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55, 63 (1967).

We agree with those cases. The social purpose of the doctrine of strict liability, i.e., the spreading of the risk of injuries caused by defective products among all the purchasers of those products by holding the manufacturer liable is laudable, and before comparative fault was adopted, that purpose would have been defeated by permitting a manufacturer to escape liability if an injured plaintiff were in any degree contributorily negligent.

Since the advent of comparative fault in Missouri, however, one reason for not considering contributory negligence in strict liability cases has been eliminated. Comparative fault may now be considered without completely relieving the manufacturer of the defective product from liability.

We believe, therefore, that with the adoption of comparative fault in Missouri, the social purpose of the strict liability doctrine is carried far enough by allowing a plaintiff to avoid proof of negligence simply by proving that the product was defective in design or manufacture and caused the injury; and that a plaintiff should be

**1.** Ariz.Rev.Stat.Ann. §§ 12–2505—12–2509 (1984); Ark.Stat.Ann. § 27–1763 (Supp.1983); Mich.Stat.Ann. § 27A–2945–2949 (Supp.1982) M.C.L.A. §§ 600.2945–600.2949; Neb.Rev.Stat. § 25–1151 (1983); Wash.Rev.Code Ann. §§ 4.22.020, 7.72.010—7.72.060 (1984).

*Butaud v. Suburban Marine & Sporting Goods, Inc.*, 555 P.2d 42 (Alaska 1976); *Daly v. General Motors*, 20 Cal.3d 725, 575 P.2d 1162, 144 Cal. Rptr. 380 (1978); *West v. Caterpillar Tractor Company*, 336 So.2d 80 (Fla.1976); *Kaneko v. Hilo Coast Processing*, 65 Hawaii 447, 654 P.2d 343 (1982); *Coney v. J.L.G. Industries, Inc.* 97 Ill.2d 104, 73 Ill.Dec. 337, 454 N.E.2d 197 (1982); *Forsythe v. Coats Company, Inc.*, 230 Kan. 553, 639 P.2d 43 (1982); *Jack Front, Inc. v. Engineered Building Components Company, Inc.*, 304 N.W.2d 346 (Minn.1981); *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843 (1978); *Cartel Capital Corp. v. Fireco of New Jersey*, 81 N.J. 548, 410 A.2d 674 (1980); *Scott v. Rizzo*, 96 N.M. 682, 634 P.2d 1234 (N.M.1981); *Codling v. Paglia*, 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973); *Baccelleri v. Hyster Company*, 287 Or. 3, 597 P.2d 351 (1979); *Fiske v. MacGregor, Div of Brunswick*, 464 A.2d 719 (R.I. 1983); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984); *Mulherin v. Ingersoll-Rand Co.*, 628 P.2d 1301 (Utah 1981); *Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854 (W.Va.1982); *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967); *Cline v. Sawyer*, 600 P.2d 725 (Wyo.1979).

**2.** *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.* 411 F.Supp. 598 (D.Idaho 1976); *Edwards v. Sears, Roebuck and Co.* 512 F.2d 276 (5th Cir.1975); *Trust Corp. of Montana v. Piper Aircraft Corp.* 506 F.Supp. 1093 (D.Mont.1981).

held responsible for any share of the damages proportional to his fault.

The New Hampshire Supreme Court, in disagreeing with a commentator who advocated a social engineering approach that would eliminate completely the requirements of causation and product defect said:

> The common-law principle that fault and responsibility are elements of our legal system applicable to corporations and individuals alike will not be undermined or abolished by 'spreading' of risk and cost in this State.

*Thibault v. Sears, Roebuck and Company*, 395 A.2d 843, 846[1].

This is a reasonable approach when considering the question of the application of comparative fault to the doctrine of strict liability. Judicial decisions in new fields of law, or extensions of existing fields of law, necessarily carry with them a degree of social engineering when they affect large segments of the population, both producers and consumers, as does the doctrine of strict liability.

Nonetheless, this tendency to use the courts as instruments of social engineering has been carried to extremes, particularly in some of the federal courts, and should be restrained by established principles of the common law and our constitutions. Otherwise the basic and desirable separation of powers between the legislative and the judicial branches of our government will be eroded still further, to the detriment of all segments of our society.

We believe the law and the public is best served by requiring not only the manufacturer who is at fault (and whose fault exists regardless of negligence) to bear his share of the loss, but also by requiring the plaintiff, who is also at fault, to bear his proportionate share.

The argument is made with some vehemence by appellants that any costs of injuries should be borne by the manufacturer who sells the product rather than by the injured parties. This has been set forth in at least one Missouri case. *Cryts v. Ford Motor Company*, 571 S.W.2d 683, 687 [1] (Mo.App.1978).

The Missouri Supreme Court adopted the rule of strict liability in *Keener v. Dayton Electric Manufacturing Company, supra,* giving as one of the reasons:

> (1) '... the purpose of such liabilities is to insure that the costs of injuries resulting from defective products are borne by the manufacturers [and sellers] that put such products on the market rather than by the injured persons who are powerless to protect themselves.' Quoting from *Greeman v. Uba Power Products Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697 [701], 377 P.2d 897, 901, 13 A.L.R.2d 1049. *Keener, supra* at 364.

The *Cryts* and *Keener* courts, of course, did not consider comparative fault. When they were written, the doctrine of comparative fault had not been adopted in Missouri and contributory negligence would have been a complete defense in a strict liability case if the Supreme Court had not ruled otherwise.

The adoption of comparative fault in *Gustafson v. Benda, supra,* requires a new analysis of the law, giving consideration to the desirability of sharing any loss between manufacturer and injured party based on the proportionate fault of each.

Appellant argues that because Missouri cases have held that the concept of fault has no place in the law of strict liability, comparative fault should not be applied. The cases they cite, *Keener v. Dayton, supra, Elmore v. Owens-Illinois Inc.,* 673 S.W.2d 434, 438 (Mo. banc 1984), *Blevins v. Cushman Motors,* 551 S.W.2d 602, 608 (Mo. banc 1977), in fact do state that the concept of fault has no place in the law of strict liability. The cases refer, however, to the strict liability of the manufacturer and not to whether the fault of the consumer or injured party should be considered.

Moreover, if fair social policy is to be a basis for the law in this field, what could be fairer than to require that an injured person be made to bear a share of the burden, to the extent that he is at fault, instead of placing that burden on all of the other consumers of the product? If the

manufacturer is required to pay 100 percent of the damages, he will pass that cost on to the consuming public, an unfair assessment because all consumers would then be forced to pay for the damages caused by the injured party.

Appellant also speaks of the impossibility of comparing a concept of negligence on the part of the injured party with the concept of strict liability on the part of the manufacturer, the so-called apples and oranges argument. It is true that the negligence of a manufacturer found liable under the strict liability doctrine is irrelevant. This is not to say that the negligence of the claimant injured party should also be ignored. Although negligence and strict liability are different concepts, they are in fact different types of fault and can be compared on that basis. U.C.F.A. § 1(1) (1977) (amended 1979).

Some of the cases in other jurisdictions address this problem, if it is a problem, by saying that the issue should be decided based on the proportion of causation attributable to the manufacturer and to the consumer. This is a not unreasonable analysis, but in Missouri under *Gustafson v. Benda, supra,* we are told that comparative fault will be considered in our cases. The U.C.F.A. defines "fault" to include acts or omissions that are negligent or that subject a person to strict tort liability. Therefore, the fault of strict liability can be compared with the fault of negligence because Missouri in *Gustafson* adopted the U.C.F.A. "insofar as possible." *Id.* at 15.

If we were not to apply the comparative fault doctrine to strict liability actions, an anomalous situation results. Before *Gustafson v. Benda, supra,* contributory negligence was a complete defense to a negligence action, but no defense at all to a strict liability action. *Keener v. Dayton Electric Manufacturing Company,* 445 S.W.2d 362, 365 (Mo.1969); *Williams v. Ford Motor Company,* 454 S.W.2d 611, 618–19 (Mo.App.1970).

Since *Gustafson,* contributory negligence is a partial defense in a negligence action, but it would be no defense at all in a strict

liability action if we were to hold that the comparative fault doctrine does not apply.

On the other hand, under the U.C.F.A. assumption of risk is a degree of fault to be considered in comparative fault cases. Therefore, if the comparative fault doctrine is not applied to strict liability cases, assumption of risk would remain a complete defense to an action based on strict liability but only a partial defense to an action based on ordinary negligence.

The adoption of the comparative fault doctrine provides certainty to the law, fairness, and eliminates the inconsistencies which would exist if the doctrine were not applied in strict liability actions.

The result is that plaintiffs may now recover in a strict liability action, even though there was an assumption of risk, depending on the jury's assessment of fault. Unless the comparative fault doctrine is applied, however, assumption of risk would remain a complete defense to a strict liability action.

A plaintiff consumer, in a strict liability action is still relieved of the problems of proof under a comparative fault system. He continues to be required to prove only a defect in manufacture or design which is unreasonably dangerous and which caused physical harm.

One of the reasons for the adoption of the strict liability rule was that it was difficult, if not impossible, for plaintiffs to prove negligence on the part of manufacturers. The breach of warranty problem was of course one of the other problems of plaintiffs which was eliminated by the adoption of the strict liability rule. It abolished the requirement of privity between the manufacturer and the plaintiff. *D. Fischer, Products Liability-Applicability of Comparative Negligence,* 43 Mo.L.Rev. 431 (1978); *Wade, Products Liability and Plaintiff's Fault-The Uniform Comparative Fault Act,* 29 Mercer L.Rev. 373 (1978); *Comparative Negligence and Strict Products Liability: Where Do We Stand? Where Do We Go?* 29 Vill.L.Rev. 695 (1983–84); *See also* extensive list of

commentators in *Daly v. General Motors Corporation, supra,* 144 Cal.Rptr. at 389, 575 P.2d at 1171. *See also* 9 A.L.R.4th 633 (1981).

The application of the comparative fault doctrine to strict liability cases does not change the law relating to proof of negligence and privity by strict liability plaintiffs. They retain the right to recover without the necessity of proving either negligence on the part of the manufacturer or privity of contract with him. These reasons for the development of the theory of strict liability in tort continue to be satisfied even under a comparative fault system.

In summary, we hold that the doctrine of comparative fault as set forth in *Gustafson v. Benda, supra,* is applicable to strict liability actions in Missouri. There are three reasons for this: 1) it brings symmetry to the law by holding a plaintiff responsible for his own actions in both negligence cases and strict liability cases; 2) it comports with a policy of fairness in spreading the risk by holding a plaintiff responsible for the damages caused by his own fault and by forcing the community of consumers to bear the cost of only the damages attributable to the defective design or manufacture; 3) it is in agreement with the majority of other jurisdictions in the United States which have adopted the doctrines of strict liability and comparative fault.

Appellant asserts that Instruction No. 8, in addition to being erroneous because of the comparative fault question, is erroneous because it was vague on the point when the duty to keep a lookout arose, because appellant did not have sufficient time to avoid his injury, even though he kept careful lookout, so that failure to keep a lookout was not a cause of his injury; and because the instruction submitted an affirmative defense which had not been pleaded and was not established by the evidence and was accordingly waived. The points are not well taken.

Instruction No. 8 was a modified version of MAI 32.01(1) with a percentage of fault paragraph and definitions of "negligent" and "ordinary care" added. It was simple, brief, impartial and free from argument as required by Rule 70.02(e). It did not require the jury to find detailed evidentiary facts.

It instructed the jury that they must assess a percentage of fault to the plaintiff (Instruction No. 9 of the MAI Committee Comparative Fault Instruction illustrations) if he failed to look where he was placing his right hand at the time of his accident. Appellant complains because no specific time was mentioned. It would be impossible to be more specific than to say at the time of his accident unless one would say two seconds before or two seconds after, or use some other period of time, a detailed evidentiary fact.

It was a factual matter for the jury to determine under the instruction, which was as clear to a juror of average intelligence and understanding as an instruction could be. Plaintiff knew that the cutter head of the jointer machine was dangerous. He knew that if he touched it he would be injured. When the accident happened he was reaching for a board which had dropped out of his hand and he knew the board was close to the cutter head when it fell.

It was for the jury to determine whether 1) he failed to keep a lookout and 2) whether that failure to keep a lookout contributed to cause his injury. "What constitutes negligence and failing to keep a lookout in any direction at any particular time or place depends upon the conditions and circumstances and is usually a jury question." *Slaughter v. Myers,* 335 S.W.2d 50, 54 (Mo. 1960); *see also Charles v. Ryan,* 618 S.W.2d 220 (Mo.App.1981). "[W]hether a litigant has failed to see what he should have seen is itself usually a question for the jury." *Coulter v. Bi-State Development Agency of Missouri-Illinois Metropolitan District,* 434 S.W.2d 793, 796 (Mo. App.1968). The issue of negligence is normally a jury question. *Rickman v. Sauerwein,* 470 S.W.2d 487, 489 (Mo.1971).

A reference to "at said point mentioned in the evidence" in a plaintiff's verdict di-

recting instruction on vigilant watch and lookout was not objectional as vague and confusing or giving the jury a roving commission as to when the defendant should have discovered plaintiff's oncoming automobile. *Davis v. Werremeyer*, 377 S.W.2d 319, 324 (Mo.1964).

Appellant cites automobile cases in his argument. *Slaughter v. Myers*, 335 S.W.2d 50 (Mo.1960); *Charles v. Ryan*, 618 S.W.2d 220 (Mo.App.1981); *Coulter v. Bi-State Development Agency of the Missouri-Illinois Metropolitan District*, 434 S.W.2d 793 (Mo.App.1968). The cases are not apposite, because they involve moving vehicles instead of a machine which does not move with a cutter blade which, although moving, occupies essentially the same space at all times.

Appellant also complains that there was not substantial evidence presented to support a finding that he could have avoided or lessened his injuries had he looked where he was placing his right hand at the time of his accident. This was a question for the jury to decide under all the evidence. The jury could have found that appellant could have looked, failed to do so, and if he had looked, he could have avoided his injury.

Evidence of contributory negligence by reason of appellant's failure to keep a lookout came in without objection during the trial. Although comparative fault was not pleaded, it was tried by the express or implied consent of the parties and therefore must be treated in all respects as if it had been raised in the pleadings. Rule 55.33(d).

The case was filed before *Gustafson v. Benda, supra*. The original answer filed pleaded contributory fault because comparative fault was not a part of our law at that time. Again there is the problem of semantics. The contributory fault pleading would seem to be the same as contributory negligence, although respondent's brief differentiates between the two, perhaps because contributory fault has sometimes been used to describe assumption of risk defenses. In 3 Restatement, Law of Torts, First, § 524 dealing with ultrahazardous activities, what might be described as an assumption of risk defense is referred to as contributory fault. This term and the restatement is also referred to in *Keener v. Dayton, supra*, at page 365[4–5].

Under the U.C.F.A., the semantic problems are lessened, if not eliminated. Contributory negligence, contributory fault and assumption of risk are all faults to be compared in determining liability.

At any rate, the contributory negligence issue was tried by consent, the evidence came in without objection, and the jury could have found that the evidence supported the defense. There was no error.

Appellant's other two points allege error in the exclusion of evidence of appellant's inability to study architecture and become an architect because of the injury to his hand. He offered this evidence to show a loss of future earnings.

Plaintiff was a university graduate with a degree in history, thirty years old at the time of trial. He had never studied architecture. He offered to prove that his employer, Hellmuth, Obata and Kassabaum, would have sent him to architectural school.

Any loss alleged was completely speculative because there was no reasonable certainty that appellant would ever start architectural school, much less finish and be employed in that profession. An extended discussion of this point would have no precedential value and it is denied in compliance with Rule 84.16(b).

The judgment is affirmed.

SMITH, P.J., concurs.

SATZ, J., concurs in separate concurring opinion.

SATZ, Judge, concurring.

Should and can comparative negligence be a defense in a strict products liability action? That is the question here. The majority answered it with a "Yes." I agree with the answer but do so for slightly different reasons.

In *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983), our Supreme Court applied the doctrine of pure comparative fault in a negligence action and "supplant[ed] the doctrines of contributory negligence, last clear chance, and humanitarian negligence with a comprehensive system of comparative fault...." *Gustafson,* 661 S.W.2d at 16. But, as indicated in the majority opinion here, the Court in *Gustafson* went further. It "adopted" the doctrine of pure comparative fault "for the trial of tort cases" and, as a general direction "for accomplishing the transition to comparative fault," directed the courts in Missouri to apply the doctrine "[i]nsofar as is possible." *Gustafson,* 661 S.W.2d at 15. Thus, *Gustafson* cannot be simply confined to its facts, and the issue here cannot be summarily dismissed on that basis.

In *Gustafson,* our Supreme Court adopted the doctrine of pure comparative fault because of the Court's concept of simple fairness. *Gustafson,* 661 S.W.2d at 15. Prior to *Gustafson,* the Court's concept of simple fairness also caused it to adopt the doctrine of strict products liability. *Keener v. Dayton Electric Mfg. Co.,* 445 S.W.2d 362, 364 (Mo.1969). For each doctrine, fairness was translated into specific policy reasons, and the policies are carried out by specific concepts. Since both doctrines now apply in an area once exclusively controlled by rules of negligence, the meeting of respective policy reasons and of respective concepts was inevitable. Whether conflicts between doctrinal policy reasons and conflicts between doctrinal concepts are also inevitable, however, depends solely on the policy reasons selected to justify each doctrine and on the definitions given the concepts implementing each doctrine. More specifically, the particular reasons and concepts selected determine the "conceptual feasibility and doctrinal desirability of comparing the misconduct of the plaintiff with the strict liability imposed on the defendant under § 402A, [Restatement (Second) of Torts (1965)]." *Murray v. Fairbanks Morse,* 610 F.2d 149, 156 (3d Cir.1979).

In the strict products liability action, the defendant is presumptively liable if he puts a defective and unreasonably dangerous product on the market. *See e.g., Racer v. Utterman,* 629 S.W.2d 387, 392–93 (Mo. App.1981), *cert. denied,* 459 U.S. 803, 103 S.Ct. 26, 74 L.Ed.2d 42 (1982). He bears this liability even though the injured plaintiff negligently "fails to discover the defect in the product or [negligently fails] to guard against the possibility of its existence." Restatement (Second) of Torts § 402A comment n (1965). The defendant, however, is relieved from liability if the injured plaintiff knew of the defect and "voluntarily and unreasonably" encountered it. *Id.* Thus, in a strict products liability action, a distinction is made between the defense of objective contributory negligence and the defense of subjective assumption of risk ("contributory fault"). Assumption of risk however, is just a variant and more egregious form of contributory negligence. *See, e.g., Bullock v. Benjamin Moore & Co.,* 392 S.W.2d 10, 13 (Mo.App.1965); Prosser, *Torts* § 68, at 441 (4th ed. 1971). Why then was the distinction made? The answer to this question is essential to answering the question here. If the policy reasons justifying the doctrine of strict products liability compelled the courts to exclude objective contributory negligence as a defense, then the policy reasons justifying the doctrine of comparative fault may not be of sufficient countervailing weight to eliminate this exclusion.

The reasons justifying the doctrine of strict products liability rest on the courts' economic and social model of our society and the courts' basic belief that this model demands the "[defendant] bear the financial burden of the injuries which his defective products cause." Feinberg, *The Applicability Of A Comparative Negligence Defense In A Strict Products Liability Suit,* 1975 Ins.Couns.J. 39, 40. This basic belief has been variously expressed, *see, e.g., Greeman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (Cal. banc 1963); *Escola v. Coca Cola Bottling Co.,* 24 Cal.2d 453,

150 P.2d 436, 443 (1944) (Traynor, J., concurring); Restatement (Second) of Torts § 402A comment c (1965),[1] and most, if not all, of these expressed reasons have been adopted or acknowledged with tacit approval by the courts in Missouri. *See, e.g., Keener v. Dayton Electric Mfg. Co.,* 445 S.W.2d 362, 364 (Mo.1964); *Katz v. Slade,* 460 S.W.2d 608, 611–13 (Mo.1970). *See also Blevins v. Cushman Motors,* 551 S.W.2d 602, 613 (Mo. banc 1977); *Giberson v. Ford Motor Co.,* 504 S.W.2d 8, 12 (Mo. 1974); *Winters v. Sears, Roebuck & Co.,* 554 S.W.2d 565, 573 (Mo.App.1977). The reasons may be divided into two admittedly overlapping groups: one focuses primarily on the defendant; the other focuses primarily on the plaintiff. Neither group will permit comparative negligence as a defense in strict products liability without raising serious policy conflicts. These conflicts must be addressed.

The first group of policy reasons imposes strict liability on the defendant because of his risk-bearing capacity, profit seeking motive and creation of risk. Included also is a desire to deter him from putting dangerous products on the market. *See, e.g., Greenman,* 27 Cal.Rptr. at 701, 377 P.2d at 901; *Katz,* 460 S.W.2d at 611. These reasons, however, do not compel the complete exclusion of objective contributory negligence as a defense. It is one thing to hold a defendant presumptively liable because of his risk-bearing capacity, profit seeking motive and creation of risk, "[it is] quite another to use the same arguments to hold

him liable for the fault of someone else." Levine, *Buyer's Conduct,* 52 Minn.L.Rev. 627, 648 (1968). Nonetheless, courts could have consciously chosen to exclude any consideration of objective contributory negligence but not subjective assumption of risk because they believed their expressed policy could be achieved simply by excluding the former defense and not the latter. If the exclusion of plaintiff's contributory negligence were for this reason, the exclusion should continue after the adoption of the doctrine of comparative fault. The perceived economic and social model requiring this exclusion has not changed significantly since the adoption of strict products liability, and certainly, it was not changed by the adoption of comparative fault. Thus, if it were fair to impose the entire financial burden on the defendant prior to the adoption of comparative fault, it is still just as fair after its adoption. Therefore, comparative negligence should not be a defense in a strict products liability action.

The second group of reasons also precludes comparative negligence, or at least certain kinds of comparative negligence, as a defense to strict products liability. In our complex, technological society, it is said, the consumer has neither the ability nor knowledge to discover defects in products; therefore, the consumer must rely on the representation of safety impliedly made by the defendant when he markets his product. *Keener,* 445 S.W.2d at 364.[2] Under this reasoning, the plaintiff's failure to discover or guard against a defect must be

1. For example, comment c of § 402A states: On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the con-

sumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

2. The consumer no longer has the means or skill enough to investigate for himself the soundness of a product ... and his erstwhile vigilance has been lulled by the steady efforts of manufacturers to build up confidence by advertising and marketing devices.... Consumers no longer approach products warily but accept them on faith, relying on the reputation of the manufacturer or the trade mark. *Escola v. Coca Cola Bottling Co.,* 24 Cal.2d 453, 150 P.2d 436, 443 (Cal 1944) (Traynor, J., concurring).

excluded as a defense. A defendant who, in effect, represents his product as safe cannot sensibly complain that the injured plaintiff should not have relied on the representation. This logic remains sound. Neither plaintiff's inability to determine whether a product is safe nor the defendant's implied representation of safety has significantly changed since the adoption of strict products liability. Therefore, the adoption of comparative fault should not and cannot change this logic. In fact, several jurisdictions have found this logic persuasive and, in accepting comparative negligence as a defense to strict products liability, have explicitly excluded as a defense the failure to discover or guard against the defect.[3]

None of this reasoning, however, persuades me that comparative negligence should be excluded as a defense in strict products liability. Quite simply, I am not convinced the distinction made between objective contributory negligence and subjective assumption of risk in a strict products liability action was a consciously thought-out process.

First, in adopting the doctrine of strict products liability most, if not all, courts supported the adoption by focusing on the defendant's risk-bearing capacity, profit seeking motive, creation of risk, as well as on the use of the doctrine as a deterrent to marketing dangerous products. No one, however, expressed the opinion that these policies could be achieved only by excluding objective contributory negligence as a defense. More important, not one even intimated that excluding objective contributory negligence but not subjective assumption of risk as a defense was essential or necessary to carry out the expressed policies. This is understandable. The economic and social model of the courts was not and is

not so finely tuned that it required the exclusion of one defense but not the other.

Moreover, in adopting the doctrine of strict products liability, no court explicitly focused on the plaintiff's implied reliance on product safety as the reason for distinguishing between an inattentive plaintiff and a plaintiff with knowledge of the defect. This reasoning was expressed, if at all, only at the time a court was adopting the doctrine of comparative fault in the context of an already adopted doctrine of strict products liability. *See* cases cited *supra* note 3.

Admittedly, the distinction between objective contributory negligence and assumption of risk is explicitly incorporated into § 402A. To that extent, those courts adopting § 402 consciously adopted the distinction and, thus, also adopted the exclusion of objective contributory negligence as a defense. The Restatement's rule, however, is best described as "as a rule in search of a rationale," Schwartz, *Comparative Negligence*, § 12.6, at 203 (1974). The Restatement's explanation for disregarding objective contributory negligence is singularly unpersuasive:

Since the liability with which this Section [402A] deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies.

Restatement (Second) of Torts § 402A comment n (1965). Section 524 deals with assumption of risk in abnormally dangerous activities. That section simply states the only contributory negligence that bars the plaintiff in recovery is "knowingly and unreasonably subjecting himself to the risk" from dangerous activities. Restatement (Second) of Torts § 524(2) (1977). It is far from clear, however, "that the policies be-

---

3. [A]n injured person's conduct which in fact was a cause of her injury and which constitutes a "fault,' including negligence, is to be considered in a products liability action, unless the user's alleged negligence consists in the kind of unobservant, inattentive, ignorant, or awkward failure to discover or to guard against the defect that goes toward making the product dangerously defective in the first

place. *Sandford v. Chevrolet Div. of GM*, [292 Or. 590] 642 P.2d 624, 628 (Or.1982). *See also West v. Caterpillar Tractor Co.*, 336 So.2d 80, 92 (Fla.1976); *Coney v. J.L.G. Industries, Inc.*, [97 Ill.2d 104, 73 Ill.Dec. 337, 343–44] 454 N.E.2d 197, 203–04 (Ill.1983); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 432 (Tex. 1984); *Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854, 863 (W.Va.1982).

hind strict liability for abnormally dangerous activities are the same as those relied on by courts moving to strict products liability." Noel, *Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk*, 25 Vand.L.Rev. 93, 116 (1972). To the contrary, the respective policy reasons are different. Note, *A Reappraisal of Contributory Fault in Strict Products Liability Law*, 2 Wm. Mitchell L.Rev. 235 (1976). To me, the transference of principles from strict liability for abnormal activities to strict products liability "appears to have occurred almost 'without saying,' despite the different origin and rationale of these heads of strict liability." Fleming, *The Supreme Court of California 1974-1975—Forward: Comparative Negligence at Last—By Judicial Choice*, 64 Calif.L.Rev. 239, 269-70 (1976). *See also* Note, *A Reappraisal, supra*, at 236-39.

The most cogent, yet unarticulated, factor for excluding contributory negligence was the constraint of the negligence principles existing when strict products liability was created. Contributory negligence was a complete bar to the plaintiff's action. The courts distrusted this harsh all-or-nothing rule. *See* Noel, *supra*, at 111; Schwartz, *supra*, at 204. It was simply unfair to withhold all protection from a slightly inattentive consumer of a defective product. More important, perhaps, to do so would beg common sense. The doctrine of strict products liability was created to give increased protection to the plaintiff. Barring his recovery for being even slightly inattentive would destroy the protection that had just been created. If this hypothesis is correct, and I believe it is, then, as the majority states, it is sensible to ask whether the rule barring objective contributory negligence as a defense deserves to survive under comparative negligence, now that it is "possible to penalize the plaintiff's failure to protect himself without denying him all protection of the law." Fleming, *supra*, at 270.

Why should the defendant, innocent users of the product or the community at large absorb a loss due, in part, to plaintiff's fault? The answer rests on fundamental concepts of fairness. Making a group responsible for an individual's action is almost always unfair. Moreover, the primary justification for the rule of contributory negligence, in any context, is "the feeling that if one man is to be held liable because of his fault, then the fault of him who seeks to enforce that liability should also be considered." 2 Harper & James, The Law of Torts, § 22.3, at 1207 (1974). This feeling is put into practice by comparative negligence.

I believe strict products liability was developed mainly to provide more protection for the consumer than is available under negligence principles. Reducing the damages of a plaintiff who can protect himself but who negligently contributes to his own injury does not seriously impair that protection.

Nor am I persuaded that we should tailor the defense of comparative negligence to protect the consumer's theoretical reliance on product safety. To attempt to distinguish various kinds of negligence and to attempt to exclude only the plaintiff's failure to discover or to guard against a defect would simply put us back into a conceptual morass. Comparative fault is attractive because it is simple. Under its principles, we avoid the difficulty of distinguishing "failure to discover the defect or guard against the possibility of its existence" from "lack of ordinary care;" between "contributory negligence" and "forseeable and unforseeable misuse;" and between "contributory negligence" and "assumption of risk." If we succumb to the temptation of making exceptions for comparing negligence, "exceptions will soon swallow the rule, and the application of pure comparative-fault principles will become just as uncertain, just as unfair, just as artificial, and in some instances just as harsh, as was the old doctrine of contributory negligence." *Simpson v. General Motors Corp.*, 108

Ill.2d 146, 90 Ill.Dec. 854, 860, 483 N.E.2d 1, 7 (Ill.1985) (Ryan, J., dissenting).[4]

### Conceptual Feasibility

As pointed out by the majority, forceful argument has been made that the concept of strict liability for products is different in kind from the concept of negligence in using the product, and, logically, it is argued, the two cannot be compared and weighed against each other. *See generally*, Wade, *Products Liability And Plaintiff's Fault—The Uniform Comparative Fault Act*, 29 Mercer L.Rev. 373 (1978).[5] Similar to mixing and comparing "apples and oranges" or "oil and water," it is argued, a mixing and comparing of fault and no-fault is not conceptually feasible. *Id.* at 376. This conceptual conflict is more imagined than real.

Arguably, strict products liability focuses on the product rather than the defendant's conduct. This, however, does not prevent the jury in a strict products liability action from weighing the plaintiff's conduct against the product or from comparing plaintiff's fault with the defendant's lack of fault. When the plaintiff is charged with assumption of risk (contributory fault) and the evidence is sufficient, the jury may be required to determine whether plaintiff unreasonably assumed the risk in using the product. If the jury so concludes, then it is directed to find for the defendant. MAI 32.23 (3d 1981). *See also Keener v. Dayton Electric Co.*, 445 S.W.2d 362; *Williams v. Ford Motor Co.*, 454 S.W.2d 611, 619–20 (Mo.App.1970). Assumption of risk, use of the product after discovery of the defect, is both conduct and fault. This comparison of conduct with product defect, or, fault with no fault, seemingly causes no one a problem in logic.

Alternatively, to satisfy the pristine logician, it can be and has been assumed that, in a strict products liability action, we do compare the defendant's conduct with the plaintiff's conduct. This court, as well as others, has stated the defendant's breach of duty is the act of placing a defective and unreasonably dangerous product into the stream of commerce. *See Racer v. Utterman*, 629 S.W.2d 387, 395 (Mo.App.1981), *cert. denied*, 459 U.S. 803, 103 S.Ct. 26, 74 L.Ed.2d 42 (1982).[6] *See also Austin v. Raybestos—Manhattan, Inc.*, 471 A.2d 280, 285 (Me.1984). This concept premises the defendant's liability on his conduct; and, thus, it permits the trier of fact to compare the defendant's conduct with the conduct of the plaintiff.

To me, the most acceptable method of avoiding conceptual conflicts is to treat the Uniform Comparative Fault Act for what it really is. It is a comparative cause act.[7] Under the Act, all causes of an injury, independent or concurrent, may be apportioned on a percentage basis. The loss for a particular injury can be simply apportioned "between the product defect and the plaintiff's misconduct ... [by comparing] the causative contribution of each to the particular loss or injury." *Murray v. Fairbanks Morse*, 610 F.2d 149, 159 (3d Cir. 1979). In short, the jury would not compare the defendant's non-existent fault with the plaintiff's fault; rather, the jury would be directed to compare how much of the injury was caused by the defect and how much was caused by the plaintiff's misconduct.

---

4. New Jersey, a comparative fault state, excepts the defense of "ordinary" contributory negligence in a strict products liability action, when, as here, the plaintiff's injury is work related. *See e.g., Suter v. San Angelo Foundry & Mach. Co.*, 81 N.J. 150, 406 A.2d 140 (1979). This exception sounds attractive. A worker may have no choice in the tools or equipment furnished him on the job. The policy in New Jersey which dictates this exception, however, also dictates the exception in negligence actions. *See, e.g., Green v. Sterling Extruder Corp.*, 95 N.J. 263, 471 A.2d 15 (1984). This policy does not square with our policy in Missouri. *See*

*Stevens v. Durbin-Durco*, 377 S.W.2d 343, (Mo. 1964).

5. Professor Wade vigorously disagrees with this argument.

6. The Court made this statement knowing others have said the doctrine of strict products liability renounces not only the concept of fault but also the concept of duty.

7. I do not believe the label "fault" is as constraining as the majority does.

**518**

There are those who argue no reasonable instruction can be given to the jury to guide it in making this comparison. *See, e.g., Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 396, 575 P.2d 1162, 1178 (Cal.1978) (Jefferson, J., dissenting). I disagree. We now instruct the jury on much more complicated issues. Given definite ground rules, our practicing bar has always been ingenious enough to comply. Admittedly, in a strict products liability case, the jury may have a natural tendency to focus on the plaintiff as the party most noticeably blameworthy. Careful instruction, however, could cure this tendency and give the jury the proper formula for apportioning damages. Under this instruction, the jury would ascribe 100% fault to defendant once it found his product to be defective and unreasonably dangerous and the defect caused or contributed to cause plaintiff's injury. If plaintiff's fault is also present, the jury would be instructed to reduce the 100% figure in proportion to plaintiff's causal contribution to his own injury.

There are also those who would argue this evaluation of comparative fault is beyond the prowess of the jury. I again disagree. This task is no more difficult than determinations we now ask the jury to make. For example, on conflicting expert evidence, we ask the jury to determine whether a plaintiff's hiatus hernia was caused by an auto accident which occurred three months prior to the hernia being diagnosed. *See Bertram v. Wunning,* 385 S.W.2d 803, (Mo.App.1965), appeal on remand, 417 S.W.2d 120 (Mo.App.1967). Moreover, with no apparent difficulty, "[d]ivision of damages according to fault is found in cases where plaintiff and defendant both pollute the same stream or flood the plaintiff's property, where two or more defendants pollute a stream, where two defendants inflict personal injury on separable areas of the plaintiff, where defendants' animals together cause injury, and in cases involving nuisance due to noise or air pollution. By the same token, apportionment is made in cases of separate repetitions of the same defamatory statements or separate acts resulting in alienation of affections." Levine, *Buyer's Conduct, supra,* at 655–56.

In short, I find no insurmountable doctrinal or conceptual conflicts between strict products liability and comparative fault. Therefore, I see no real problem in comparing a plaintiff's misconduct with the strict liability imposed on a defendant by § 402A.

I concur with the majority.